Edward SCHRANK, Plaintiff,

v.

Guy BLISS, Individually and as Sheriff of Lake County, Florida, Defendant.

No. 75–46–Civ–Oc.

United States District Court,
M. D. Florida,
Jacksonville Division.

April 9, 1976.

---

29

Ben R. Patterson, Michaels & Patterson, Tallahassee, Fla., for plaintiff.

Jack M. Skelding, Jr., and John W. Costigan, Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, Fla., for defendant.

## OPINION AND PRELIMINARY INJUNCTION

CHARLES R. SCOTT, District Judge.

This cause, commenced under 42 U.S.C., Sec. 1983 (1970), and 28 U.S.C., Secs. 1331; 1343(3), (4); 1651; 2201 and 2202, is before the Court on plaintiff's Motion For A Preliminary Injunction. After a hearing on the motion, as well as a subsequent supplementary hearing to update the Court's evidentiary basis concerning plaintiff's status, the Court makes the following findings of fact and conclusions of law as grounds for its issuance of the preliminary injunction.

## FINDINGS OF FACT

Plaintiff, Edward Lewis Schrank, is twenty-five years old, has been married for seven years, and has no children. Since November 1, 1974, he has been employed as a deputy sheriff of the Lake County Sheriff's Department. He has a high school diploma, approximately two years of college-credit study, and received certification from the Police Standards Board after completing three hundred and twenty (320) hours of basic training for his job. He personally paid for the tuition and supplies required for the training. He was not paid while attending training.

Since November 1, 1975, plaintiff has lived in a house which he rents from the United States Forestry Service for $80.00 per month. He lived there first as a tenant at will and then entered into a lease because, as a deputy sheriff of Lake County, he was assigned to forest service patrol at the Pittman Work Center. Paragraph 31 of the lease expressly conditions his continued residence as a tenant upon his continued employment with the Lake County Sheriff's Department. Plaintiff had the use of a Sheriff's Department vehicle while so employed.

After his first six months of employment, indisputably termed the "probationary period" by all witnesses in this cause, plaintiff received a raise of $50.00 per month. There is evidence that plaintiff was at least a satisfactory employee, and at best an excellent deputy. Defendant so averred in his deposition. He had so written in a letter on October 31, 1975 to Mr. and Mrs. George Buizing of Cincinnati, Ohio. The Buizings had spent some time visiting the Lake County, Florida, area and had found the plaintiff to be of assistance and service to them. Upon their return to Ohio they wrote to Sheriff Bliss a letter of commendation concerning plaintiff. In replying, Sheriff Bliss wrote: "Deputy Schrank is a fine officer and we feel he typifies the type of man we want working as a Lake County Deputy." In addition, plaintiff called as a character witness his former supervisor at the Lake County Sheriff's Department, Sgt.

Stephen James Simon, now Chief of Police of the City of Mt. Dora. Chief Simon testified that plaintiff is a "conscientious, dedicated and honest law enforcement officer who takes initiative on his own and needs very little supervision. He's a hard worker." In addition, Chief Simon declared that in the community, plaintiff has the reputation as "a very honest man."

Defendant, the Honorable Guy C. Bliss, is the Sheriff of Lake County, Florida, an elected official under Florida Constitution, art. VIII, Sec. 1 (1968) and *Fla.Stat.*, Sec. 100.041 (Supp.1973). He was plaintiff's employer from November 1, 1974 to November 14, 1975.

For approximately six (6) months prior to October 31, 1975, plaintiff and his wife lived in a house owned by Mrs. Hawkins, the landlady. During that time, one of Mrs. Hawkins' former tenants commenced a civil action against her in the Fifth Judicial Circuit Court of the State of Florida, alleging trespassory entry and removal of personal property. Plaintiff was to be called as a witness for the former tenant, and against Mrs. Hawkins, in that action. There then ensued a disagreement between Mrs. Hawkins and plaintiff concerning payment of electric utility bills for his apartment. Mrs. Hawkins wrote plaintiff a letter, and plaintiff replied with a letter declaring that he had paid the bills and had cancelled checks to prove the payments. At the hearing before the Court, the evidence was uncontroverted that plaintiff did in fact have cancelled checks to prove his payment of former electric bills. In October, 1975, Mrs. Hawkins again charged plaintiff with failing to pay his electric utility bill, and another dispute arose. On or about November 12, 1975, Mrs. Hawkins telephoned defendant, Sheriff Bliss, and then visited the Sheriff's office concerning the purportedly unpaid electric bill. On November 12, 1975, plaintiff was contacted by Sheriff Bliss, who instructed plaintiff to go to Mrs. Hawkins, settle the matter in dispute and satisfy her or he would take care of the matter. Sheriff Bliss gave plaintiff twenty-four (24) hours to do this, telling him to report back

the next day. Plaintiff contacted his attorney who also represented the former tenant of Mrs. Hawkins in the lawsuit against her. That attorney, Michael Hatfield, Esquire, instructed plaintiff not to go near Mrs. Hawkins. Attorney Hatfield then telephoned the Sheriff to inquire about the matter and was assured by the Sheriff that plaintiff need not fear the extreme reprisals, but that the Sheriff wanted the matter of the disputed electric bill taken care of.

On November 13, 1975, the day following plaintiff's instructions from the Sheriff to settle the matter of the disputed electric bill, plaintiff tried to see Sheriff Bliss; but the Sheriff was away. On the next day, November 14, 1975, Sheriff Bliss telephoned plaintiff's residence to tell him to stop by the Sheriff's office when he reported for work that day. When he arrived, plaintiff went to see Sheriff Bliss. Plaintiff carried his small tape recorder with him, which he believed he had a right to do in the absence of his attorney.[1] He was anxious and upset, and asked the Sheriff if the meeting might result in discipline.

The following conversation recorded by the plaintiff transpired.

SHERIFF BLISS: "Is the recorder on?"

PLAINTIFF: "Yes, sir."

SHERIFF BLISS: "I'll tell you what. In my opinion, it's insubordination in the fact that you've taken this attitude to be anti the department."

PLAINTIFF: "No, sir. I'm not. I'm 100 percent behind the department, and I work for the good of the department."

SHERIFF BLISS: "I always thought you were."

PLAINTIFF: ". . . and I try to do my best for the department, but in this particular case, this is a matter which I believe concerns her and me. And in my opinion, and the opinion of anyone who knows this woman knows that, you know, there's a personality clash with anyone she has dealings with."

SHERIFF BLISS: "All right, you turn off your machine and take it out, and we'll go from there."

PLAINTIFF: "All right, I'll shut it off. Sir, according to the Policemen's Bill of Rights, I have a right to either record this or have my attorney present."

CHIEF DEPUTY TANNER: "I consider that insubordination. You're suspended from duty."

PLAINTIFF: "Yes, sir."

CHIEF DEPUTY TANNER: "Okay. We'll notify you for your hearing."

PLAINTIFF: "All right."

CHIEF DEPUTY TANNER: "Okay."

At that point, plaintiff left defendant's office, but was recalled a short time later.

PLAINTIFF: "Yes, sir."

SHERIFF BLISS: "I thought I told you not to bring your equipment in."

PLAINTIFF: "I've been suspended now."

SHERIFF BLISS: "Have him take these things out, come back in, and we'll talk about it."

CHIEF DEPUTY TANNER: "What things?"

SHERIFF BLISS: "What he has in his hands."

PLAINTIFF: "Now, wait. This is my personal property."

CHIEF DEPUTY TANNER: "Just let him go. Don't say nothing to him. Now, I've already told you you're suspended—"

PLAINTIFF: "Right."

CHIEF DEPUTY TANNER: "—and you can—for insubordination to the Sheriff. Pick this up so—And then turn in all of your gear—"

PLAINTIFF: "Uh-huh."

CHIEF DEPUTY TANNER: "—everything that belongs to the Sheriff's Office. Then go to your attorney, or whatever you want to do, and we'll notify you of your hearing."

---

1. *Fla.Stat.* Sec. 112.532(1)(i) (Supp.1974) provides the right to have an attorney present.

PLAINTIFF: "All right. May I use the vehicle to go home and get my uniforms?"

CHIEF DEPUTY TANNER: "No. Someone will take you home."

PLAINTIFF: "All right."

CHIEF DEPUTY TANNER: "We're afraid you'll run into a tree with it or something."

PLAINTIFF: "Okay. Am I dismissed?"

SHERIFF BLISS: "No."

PLAINTIFF: "I would like to discuss this like human beings, but I'm afraid that we're not getting anywhere."

SHERIFF BLISS: "You want to do it your way, don't you?"

PLAINTIFF: "I want to do it in a way that is according to the law as I told you before."

CHIEF DEPUTY TANNER: "You're suspended. That's according to the law. You'll be notified of your hearing."

PLAINTIFF: "Okay. And the charge?"

CHIEF DEPUTY TANNER: "The charge is insubordination to the Sheriff, for one thing."

PLAINTIFF: "For trying to exercise my rights under the law?"

CHIEF DEPUTY TANNER: "You heard what I said, didn't you?"

PLAINTIFF: "Yes, sir."

CHIEF DEPUTY TANNER: "Get out of here."

On direct examination, under questioning by the Court, Chief Deputy Tanner testified that there was no authorization by the Sheriff for any kind of a hearing such as he had promised plaintiff, and that his sole purpose in telling plaintiff that he would have a hearing was to induce plaintiff to leave the Sheriff's office at once. Attorney Michael Hatfield again contacted the Sheriff and requested a hearing for plaintiff. However, one week later, on November 20, 1975, plaintiff received a letter from defendant, Sheriff Bliss, notifying him that he had been terminated. The letter stated that the effective date of plaintiff's termi-

nation was November 14, 1975, a week earlier than the letter, and the same date as plaintiff's suspension, when defendant Sheriff Bliss had told plaintiff that he was not dismissed, and when Chief Deputy Tanner told him he would be notified of a hearing date. In the more than four months since his termination, plaintiff has had no hearing concerning his suspension or his termination and he has received no written statement of the reasons that might constitute just cause for his suspension or termination other than the November 20, 1975, letter notifying him of his termination.

Louis J. Rousch, Chief of the Bureau of Standards, Division of Standards and Training, Department of Criminal Law Enforcement, testified at the hearing. He testified that every candidate for a job as a law enforcement officer, including plaintiff, must complete successfully a three hundred and twenty (320) hour basic recruitment course to acquire the minimum standards for employment. Upon completion, the candidate receives a certification of eligibility for employment, which means that he has the minimum standards from the Bureau. Upon termination, the employing law enforcement agency notifies the Bureau of Standards which removes the officer's certificate from active status. All potential employers must contact the Police Standards Bureau; and they would learn that plaintiff's certification was no longer active, and that he had been terminated involuntarily from his previous employer, the Lake County Sheriff's Department. Both a notice of termination card and a letter were sent by defendant, Sheriff Bliss, informing the Bureau of Standards that plaintiff had been terminated involuntarily for insubordination.

The files of the Bureau are open to the public and any potential employer would be referred to the defendant, Sheriff Bliss, for further information about the plaintiff's dismissal for insubordination. In addition, several articles in local newspapers have quoted the defendant, Sheriff Bliss, that plaintiff was terminated for insubordina-

tion and conduct unbecoming a law enforcement officer.

Plaintiff has lost the medical insurance coverage that he had while employed as a deputy sheriff. Plaintiff's wife has a history of serious medical problems, and is sufficiently disabled visually to be regarded as legally blind. Plaintiff has three checking accounts—two for him and his wife separately and one jointly—the total of which at the supplementary hearing on March 11, 1976, was less than. $100.00 in available cash. Plaintiff has been unsuccessful in attempting to secure employment with other law enforcement agencies in Orange and Volusia counties, Florida. Although plaintiff's wife was employed for a short while as a draftsman, she has been laid off and there is now no source of income for them. Plaintiff attempted to realize income from a firewood business, but lost about $400.00 in the enterprise. He bought a 1976 Chevrolet pickup truck in December to enable him to transport firewood for his business. By using a $16,000.00 time certificate which he inherited, as collateral for a cash loan, he was able to buy the pickup truck. The time certificate's maturity date is July, 1977. If he were to withdraw the certificate before the maturity date, he would suffer a substantial penalty in the forfeiture of more than a $1,000.00 in interest. In addition to the expenses for the necessities of life, plaintiff has monthly medical bills for corrective contact lenses for his wife, and an educational loan.

## CONCLUSIONS OF LAW

A preliminary injunction is an extraordinary equitable remedy. *Sampson v. Murray*, 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 942, 39 L.Ed.2d 166, 187 (1974); *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). Whether the Court denies or grants a motion for preliminary injunction it is necessary to make clear and specific findings of fact and conclusions of law. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 70*, 415 U.S. 423, 443,

94 S.Ct. 1113, 1126, 39 L.Ed.2d 435, 452 (1974); *Canal Authority of the State of Florida v. Callaway, supra*, at 578. There are always changes in existing conditions, but not every change warrants such extraordinary relief as a preliminary injunction. In exceptional situations, however, where an irremediably deteriorating condition threatens to thwart the Court's ability to render a proper final judgment on the merits later, the Court must act to preserve or restore the vanishing status quo ante. *Canal Authority of the State of Florida v. Callaway, supra*, at 573, 576. In such situations, the Court must determine whether the plaintiff has met his burden of showing the existence of four necessary criteria:

(1) Irreparable injury because of the unavailability of an adequate remedy at law;

(2) Substantial likelihood of the plaintiff's success on the merits;

(3) Threatened injury to the plaintiff outweighs any possible injury to the defendant;

(4) Issuing a preliminary injunction will not work any disservice to the public interest. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 70, supra*, 415 U.S. at 441, 443, 94 S.Ct. at 1125–1126, 39 L.Ed.2d at 452; *Sampson v. Murray, supra*, 415 U.S. at 84 n. 53, 94 S.Ct. at 950, 39 L.Ed.2d at 183; *Buchanon v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975); *Canal Authority of the State of Florida v. Callaway, supra*, at 572; *Blackshear Residents Organiz. v. Romney*, 472 F.2d 1197, 1198 (5th Cir. 1973); *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir. 1972). The Court must balance carefully the evidence on each of those criteria by means of a sliding-scale analysis. A much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. *State of Texas v. Seatrain International, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975); *Siff v. State Democratic Exec. Committee*, 500 F.2d 1307 (5th Cir. 1974); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3rd

Cir. 1974). Nevertheless, the principal and overriding prerequisite is irreparable harm resulting from the absence of an adequate legal remedy. *Sampson v. Murray, supra,* 415 U.S. at 88–92 and n. 68, 94 S.Ct. at 952–953, 39 L.Ed.2d at 185–187.

### 1. Irreparable Injury.

In *Sampson v. Murray, supra,* a probationary Federal employee sought a temporary restraining order from a District Court to prevent her employment termination. At the same time her administrative appeal with the Civil Service Commission was pending. The District Court issued a temporary restraining order, which it later continued in force indefinitely when the terminating officer refused to appear and testify at a hearing scheduled on a motion for preliminary injunction.

The Court of Appeals for the District of Columbia divided over the issue, but upheld the District Court. The Supreme Court of the United States, however, reversed. The Court held that the circumstances of that case did not constitute the irreparable injury that is necessary for the extraordinary relief of a preliminary injunction. Specifically, the Court held that even if there had been a showing that plaintiff would suffer loss of income and damage to her reputation as a result of her termination, such proof would fall "far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." *Id.,* at 91–92, 94 S.Ct. at 953, 39 L.Ed.2d at 187. In some cases since *Sampson v. Murray,* courts have held preliminary injunctions improper in employment-termination cases because there was no showing of irreparable injury. However, those courts, as well as the Supreme Court in *Sampson v. Murray,* allowed for the distinguishing circumstances of extraordinary cases. Additionally, other courts have found uniquely distinctive circumstances to justify issuance of preliminary injunctions in employment-ter-

mination cases. Accordingly, the Court must make its analysis here with careful detail.

*Morgan v. Fletcher,* 518 F.2d 236 (5th Cir. 1975), involved a tenured Federal career service employee who received thirty days advance notice of termination, who was entitled to a post-termination hearing on the rightfulness of her discharge but who sought a preliminary injunction from a Federal District Court prior to her removal. The plaintiff's income represented 45% of the total family income, the loss of which would probably have led to foreclosure of her home; and her termination would result in loss of her health insurance benefits, while she was in an emotionally overwrought condition that might conceivably require such benefits. *Id.,* at 238–239. Relying upon *Sampson v. Murray,* the Fifth Circuit reversed the District Court, holding that the facts did not constitute irreparable injury warranting the extraordinary relief of a preliminary injunction: plaintiff was not the sole source of her family's income; she had a statutory right to back pay if she prevailed; and any urgent need for medical insurance was at best "conjectural only." *Id.,* at 240 and n. 11. Moreover, because of the highly similar legal conclusion of the Supreme Court in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), concerning the right to a pre-termination hearing under Federal statutes, plaintiff's likelihood of success on that precise issue was largely attenuated. *Id.,* at 240–41.

■ *Wallace v. Lynn,* 165 U.S.App.D.C. 363, 507 F.2d 1186 (1974) was a case where the Court of Appeals affirmed the District Court's denial of a preliminary injunction. The employees who were to be suspended from one to five days, for conceivably genuine insubordination, had deliberately bypassed available administrative remedies and gone into the District Court. Because of the doctrine of administrative exhaustion,[2] the District Court had held that plain-

---

2. The doctrine of administrative exhaustion is that in the ordinary situations, Courts will defer exercising their jurisdiction over actions until available administrative procedures have

been exhausted. *See, e. g., Wallace v. Lynn,* 165 U.S.App.D.C. 363, 507 F.2d 1186, 1189 (1974).

tiffs failed to show a "sufficient probability of success on the merits." *Id.,* at 1189. In affirming, the D. C. Circuit citing *Sampson v. Murray* suggested that it disagreed with the District Court's finding of irreparable injury, inasmuch as back pay, retroactive re-instatement, and expungement of the personnel files were available. *Id.,* at 1188 and n. 8.

The United States District Court for the Southern District of New York, in *Fuentes v. Roher,* 395 F.Supp. 1225 (S.D.N.Y.1975), *aff'd and modified* 519 F.2d 379 (2d Cir. 1975), denied a preliminary injunction to stay administrative proceedings against a public school superintendent who had been suspended with pay. On the basis of *Sampson v. Murray,* the Court rejected plaintiff's contention that the administrative procedures he sought to avoid were futile and unconstitutionally deficient in due process, and thereby constituted irreparable harm to him. *Id.,* at 1233, 1236.

On the other hand, in *Assaf v. University of Texas System,* 399 F.Supp. 1245 (S.D. Tex.1975), the District Court issued a preliminary injunction because the defendant's violation of its own rules and regulations concerning notice of non-reappointment to a non-tenured health service professor gave him a reasonable expectation of continued employment; and consequently the deprivation of that continued employment would require procedural due process. The Court distinguished *Sampson v. Murray,* and found irreparable injury shown. In addition to his loss of income, the plaintiff would have suffered a loss of repute within the academic community as well as a denial of access to research resources vitally necessary to a scientific academician, both of which are insusceptible of compensatory measurement. *Id.,* at 1251. Similarly, the District Court in *American Fed. of Government Employees, Local 1858 v. Callaway,* 398 F.Supp. 176 (N.D.Ala.1975), enjoined the Secretary of the Army from reducing forces which would result in the loss of jobs for civil service employees. The Court distinguished *Sampson v. Murray,* in accordance with the express language of that

decision, and because there had been no testimony produced concerning the issue of irreparable harm in that decision. *Id.,* at 193–94.

In a case concerning a law enforcement employer, *Keyer v. Civil Service Commission of the City of New York,* 397 F.Supp. 1362 (E.D.N.Y.1975), the District Court enjoined a summary dismissal of plaintiffs who were non-probationary, permanent, civil service employees with unmarred records of at least satisfactory performance. Distinguishing *Sampson v. Murray* on its own expressly qualifying language the Court held that the combination of the plaintiffs' discharge from non-probationary job status, in a highly restricted job market for persons with the plaintiffs' experience and qualifications, together with the peculiarly handicapping stigma of dismissal in that profession, and the loss of attendant job benefits (such as health insurance pension benefits, and reasonable expectation of advancement), as well as the "total denial of due process" constituted sufficient irreparable injury to justify extraordinary relief. *Id.,* at 1370–72. The District Court in *Parks v. Brennan,* 389 F.Supp. 790 (N.D.Ga. 1974), found that the inadequacy and inappropriateness of traditional remedies, plus the finality of the administrative action, supplied the necessary irreparable harm to make the holding in *Sampson v. Murray* inapplicable. Moreover, the Court relied upon *Drew v. Liberty Mutual Insurance Company,* 480 F.2d 69 (5th Cir. 1973), *cert. den.* 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974), where the plaintiff was the sole family income source, a case which the Fifth Circuit, in *Morgan v. Fletcher, supra,* at 240 n. 11, suggested as possibly sound contradistinction to *Sampson v. Murray.* That same District Court, earlier in *Bloodworth v. Oxford Village Townhouses, Inc.,* 377 F.Supp. 709 (N.D.Ga.1974), enjoined the defendant corporation from increasing monthly charges or excluding coverage of electrical services from those charges. Since, in the economic reality of the plaintiffs' standard of living, such a large increase might have been "tantamount to

eviction," or might have imposed "substantial financial hardships . . . entailing large sacrifices," the Court found the necessary irreparable harm present to constitute the extraordinary situation expressly allowed for in *Sampson v. Murray. Id.,* at 719.

Finally, the Supreme Court in *Sampson v. Murray, supra,* while holding that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury," *Id.,* 415 U.S. at 90, 94 S.Ct. at 952, 39 L.Ed.2d at 186, expressly declared, however, that injunctive relief is not foreclosed "in genuinely extraordinary" cases where "the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.,* at 92 n. 68, 94 S.Ct. at 953 n. 68, 39 L.Ed.2d at 187 n. 68.

■ Unlike the probationary employee in *Sampson v. Murray, supra,* plaintiff was a non-probationary, permanent employee, whose good behavior and above satisfactory performance justified a reasonable expectation of continued employment in the circumstances of this case. In marked contrast to those plaintiffs who sought to circumvent the procedural due process of administrative proceedings, or who were assured of reasonably swift procedural due process following their suspensions or terminations, *Sampson v. Murray, supra; Morgan v. Fletcher, supra; Wallace v. Lynn, supra; Fuentes v. Roher, supra;* either of which would provide an opportunity to vindicate themselves, plaintiff neither has been afforded such procedural due process over the nearly five past months, nor has he any realistic hope of such in the foreseeable future.

Unlike the embarrassment of discharge in the presence of co-workers, which the Supreme Court rejected as not irreparable harm in *Sampson v. Murray, supra,* at 89; and unlike the stigmatization of a law enforcement employee's mere discharge by a City, which was irreparable harm, in *Keyer*

*v. Civil Service Commission of New York City, supra,* at 1370; plaintiff is handicapped by a system of police officer certification, established by State statutes, that guarantees that every potential law enforcement employer will be alerted to the fact of, and the alleged reason for, plaintiff's termination. That is both actual and official stigmatization. Moreover, unlike the apparently genuine insubordination of the suspended employees in *Wallace v. Lynn, supra;* and like the unreappointed science professor in *Assaf v. University of Texas, supra,* at 1251; the official records, and the public dissemination through the press by defendant, charging plaintiff with insubordination, especially when coupled with the highly dubious validity of that charge, constitute a scandalizing stigma to plaintiff's professional stature as a law enforcement officer.

Unlike the speculative loss in *Morgan v. Fletcher, supra,* at 240, plaintiff, whose wife has a serious medical history, has been deprived of health insurance coverage that was available through his job. Unlike the constructive eviction in *Bloodworth v. Oxford Village Townhouses, Inc., supra,* at 719, that was held to constitute irreparable injury, plaintiff faces certain and imminent actual eviction from his residence which he has been able to inhabit solely by virtue of his former employment duties. If plaintiff should be forced to leave his residence pending the outcome of this action, and the house undoubtedly rented to someone else associated with the United States Forest Service, then if the Court should render final judgment for plaintiff, nonetheless the Court will be unable to rectify the eviction resulting from plaintiff's wrongful discharge because it will be without jurisdiction over the lessor or the new lessees.

Unlike those cases where the plaintiffs were guaranteed make-whole relief in the form of back pay, *Sampson v. Murray, supra; Morgan v. Fletcher, supra;* and *Wallace v. Lynn, supra;* plaintiff has very meager prospects for recovering any of his lost wages which will continue to accumulate

unless this extraordinary equitable relief issues. In response to a question by the Court at oral argument, defendant's counsel conceded that defendant might be liable for damages if plaintiff should prevail; but he stated that plaintiff was under no duty to incur a substantial loss through forfeiture of interest by premature withdrawal of his time certificate. That plaintiff can recover his lost wages, however, is very doubtful.

If he could establish that his discharge was not only wrongful but in fact constituted an unfair labor practice, in violation of his statutory and constitutional rights [3] as a public employee [4] under State law, he might be reinstated with back pay.[5] However, plaintiff has not asserted that statutory cause of action either under the jurisdiction of the State agency [6] charged with administering the law, or under the pendant jurisdiction of this Court. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–1139, 16 L.Ed.2d 218, 227–228 (1966).

■ Although under *Fla.Stat.* Sec. 112.-532(3) (Supp.1974), a law enforcement officer has the right to bring a civil action against any person(s) or organization(s) for damages sustained while performing his official duties, or for abridgment of his civil rights arising out of the performance of his official duties, there is no provision for the recovery of back pay. Similarly, *Fla.Stat.* Sec. 112.534 (Supp.1974) authorizes the Florida Attorney General to seek injunctive relief in the state circuit courts against an employing law enforcement agency that violates the statute; but there is no provision for make-whole relief in the form of back pay. Plaintiff's recovery of accumulating lost wages may therefore be foreclosed completely.

■ First, plaintiff's recovery of lost wages may be precluded by constitutional immunity. The Eleventh Amendment bars any jurisdiction to grant retroactive relief, whether labeled "back pay," "equitable restitution," or "damages", if it is derived from public funds of the state fisc. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Indiana State Employees Ass'n v. Boehning,* 511 F.2d 834, 838 (7th Cir. 1975); *Sarteschi v. Burlein,* 508 F.2d 110, 113 (3d Cir. 1975); *Incarcerated Men of Allen County Jail v. Fair,* 507 F.2d 281, 287 (6th Cir. 1974); *Taylor v. Perini,* 503 F.2d 899, 902 (6th Cir. 1974), *cert. granted and vac'd and remanded re. propriety of awarding att'y fees under private att'y gen. theory,* 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975); *Wilkerson v. Meskill,* 501 F.2d 297, 298 (2d Cir. 1974). It matters not that the state is not named a party defendant: if the substance of the relief sought would lie against the public funds of the state treasury, the state is inevitably a real party in interest. *McAuliffe v. Carlson,* 520 F.2d 1305, 1307 (2d Cir. 1975); *Hander v. San Jacinto Jr. College,* 519 F.2d 273, 278 (5th Cir. 1975); *Faraca v. Clements,* 506 F.2d 956, 957 and n. 2 (5th Cir. 1975); *Standing Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135, 1138, 1139 (8th Cir. 1974); *Taylor v. Perini, supra,* at 903, 905. Prospective, injunctive relief such as this, however, is permissible, even if it imposes an ancillary effect on the state treasury. *Edelman v. Jordan, supra,* 415 U.S. at 668, 677, 94 S.Ct. at 1358, 1372, 39 L.Ed.2d at 675, 680; *Ex parte Young,* 209

---

3. *Fla.Constit.,* art. I, Sec. 6 (1968) and *Fla.Stat.* Sec. 447.201 *et seq.* (Supp.1974). *See Dade County Classroom Teachers' Ass'n v. Ryan,* 225 So.2d 903 (Fla.1969). *See generally,* Craver & LaPeer, *The Legal Obligations of Governmental Employers and Labor Organizations Under the Recognition—Certification Provisions of the Florida Public Employees Relations Act,* 27 *U.Fla.L.Rev.* 705–707 (1975).

4. *Fla.Stat.* Sec. 447.203(3) (Supp.1974) defines "a public employee" as anyone employed by a public employer (defined earlier) with the exception of four excluded categories.

5. *Fla.Stat.* Sec. 447.503(4)(a) (Supp.1974).

6. *Fla.Stat.* Sec. 447.205 (Supp.1975) created the Public Employees Relations Commission, a state administrative agency charged with administering its enabling act, the Public Employees Relations Act, *Fla.Stat.* Sec. 447.201 *et seq.* (Supp.1974).

U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *McAuliffe v. Carlson, supra,* at 1308; *Hander v. San Jacinto Jr. College, supra,* at 278; *Sarteschi v. Burlein, supra,* at 113; *Class v. Norton,* 505 F.2d 123, 127 (2d Cir. 1974). Relief that is effective only from the date of the order granting it is clearly prospective. *Vargas v. Trainor,* 508 F.2d 485, 491 (7th Cir. 1975), *cert. den.* 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975). Hence, in determining the threshold question of its jurisdiction to grant final relief in this case, the Court must decide (1) what kind of relief is sought ultimately, and (2) who are the real parties in interest against whom that relief would lie; and to determine the real parties in interest, the Court must ascertain (i) the source of the relief that might be ordered, and (ii) the nature of the real party from whom the relief would be derived. *Wilkerson v. Meskill, supra,* at 298. These questions are determined by the Court as a matter of federal law, *cf. Eberhardy v. General Motors Corp.,* 404 F.Supp. 826, 829 (M.D.Fla.1975), after an examination of the relevant state law. *Hutchison v. Lake Oswego School Dist. No. 7,* 519 F.2d 961, 966–67 (9th Cir. 1975); *Skehan v. Board of Trustees of Blumsburg State College,* 501 F.2d 31, 41–42 (3d Cir. 1974), *cert. granted and vac'd and remanded re. propriety of awarding att'y fees under private att'y gen. theory, and re. propriety of awarding back pay and att'y fees against individual defendants who have asserted their good faith common law immunity,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975).

 A claim for back pay seeks retroactive compensation that would be paid by county funds appropriated to the defendant's "sheriff's budget." *Fla.Stats.* Secs. 30.49(2)(b) and 30.50(2). To be sure, a county, as a political subdivision of the state, does not usually enjoy the absolute immunity from retroactive monetary liability under the Eleventh Amendment that shields the state. *Edelman v. Jordan,* 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662, 675 (1974); *Hostrop v. Board of Jr. College Dist. No. 515,* 523 F.2d 569, 577 (7th Cir. 1975); *Burt v. Board of Trustees of Edgefield County School Dist.,* 521 F.2d 1201, 1205 (4th Cir. 1975); *Hander v. San Jacinto Jr. College,* 519 F.2d 273, 278 (5th Cir. 1975); *Singer v. Mahoning County Bd. of Mental Retardation,* 519 F.2d 748, 749 (6th Cir. 1975); *Incarcerated Men of Allen County Jail v. Fair, supra,* at 287, 288. Nevertheless, whether the county here would be immune under the Eleventh Amendment, while decided as a matter of federal law, will be based on considerations of state law concerning the nature of the county, its public funds affected, and its relationship to the subject matter of this action.[7] Furthermore, the few express waivers of sovereign immunity by the State of Florida [8] do not authorize actions for the recovery of back pay; neither is there any authority under Florida law for the payment of back pay out of the sheriff's budget to deputies who might be reinstated. *Op. Att'y Gen. Fla.,* 073–91 (1973).

 Second, plaintiff's recovery of back pay, as retroactive compensation that would be drawn from county funds, is probably precluded by statutory immunity. A county, as a subdivision of the state, is not a person subject to the jurisdiction of the Court in an action under 42 U.S.C. Sec. 1983 for purposes of any relief, whether injunctive, declaratory, or compensatory. *City of Kenosha v. Bruno,* 412 U.S. 507, 513, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109, 116 (1973); *Moor v. County of Alameda,* 411 U.S. 693, 708, 710, 93 S.Ct. 1785, 1795–1796, 36 L.Ed.2d 596, 608–610 (1973); *Monroe v. Pape,* 365 U.S. 167, 192, 81 S.Ct. 473, 486, 5 L.Ed.2d 492, 507 (1961); *Vick v. Texas Em-*

7. *See, e. g., Fla.Const.,* art. VIII, Sec. 1(a) and (b); *Fla.Stat.* chs. 124–25, 128–29; and Secs. 218.01–.06 (1971); 218.20–.26 (Supp.1975); 218.30–.36 (Supp.1975); 219.01–.08 (1971). *See also, Schwab v. First Appalachian Ins. Co.,* 58 F.R.D. 615, 622–23 (S.D.Fla.1973); *Schmauss v. Snoll,* 245 So.2d 112, 113, 114–15 (3d D.C.A.1971); *Arnold v. Shumpert,* 217 So.2d 116, 120 (Fla.1968).

8. *Fla.Stat.* Secs. 768.14; 768.151; 768.28 (Supp. 1974).

*ployment Commission,* 514 F.2d 734, 737 (5th Cir. 1975) *reh. en banc den.* 520 F.2d 944 (1975), (5th Cir. 1975); *Adkins v. Duval County School Bd.,* 511 F.2d 690; *Sterzing v. Fort Bend Indep. School Dist.,* 496 F.2d 92, 93 n. 2 (5th Cir. 1974); *Cheramie v. Tucker,* 493 F.2d 586, 587–88 (5th Cir. 1974), *cert. den.* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974). It was for that lack of jurisdiction that the Court, in its order of January 21, 1976, dismissed this action against the county as a named defendant. Consequently, the Court has no jurisdiction over the county in this action, directly or indirectly, to award back pay, or even damages, if in reality they would stem from the funds of the county. *Muzquiz v. City of San Antonio,* 528 F.2d 499, 500–01 (5th Cir. 1976) *reh. en banc* 520 F.2d 993 (5th Cir. 1975); *Incarcerated Men of Allen County Jail v. Fair, supra,* at 287; *cf. Cornist v. Richland Parish School Bd.,* 517 F.2d 1032, 1033 (5th Cir. 1975). Plaintiff's retroactive wages, therefore, will continue to mount as an irreparable loss.

 Third, while plaintiff cannot regain his lost compensation from defendant personally, even his recovery of damages may be barred by common law immunity. It is settled that public executive officials, acting within their official capacity, are protected by a qualified immunity from liability, in the absence of demonstrated bad faith. *Scheuer v. Rhodes,* 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1691–1692, 40 L.Ed.2d 90, 102–103 (1974); *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288, 296 (1967); *Hutchison v. Lake Oswego School Dist. No. 7, supra,* at 968; *Thonen v. Jenkins,* 517 F.2d 3, 5 (4th Cir. 1975); *Sarteschi v. Burlein, supra,* at 113 n. 4; *Class v. Norton, supra,* at 127; *Skehan v. Board of Trustees of Blumsburg State College, supra,* at 43. Thus, unless plaintiff can show (1) that objectively defendant acted in deliberate disregard of his actual or constructive knowledge of plaintiff's indisputable constitutional rights; or (2) that subjectively defendant acted with a malicious intent to deprive plaintiff of his constitutional rights; plaintiff's relief will be blocked by defendant's good faith immunity under the common law. *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–1001, 43 L.Ed.2d 214, 224–225 (1975). Plaintiff's damages, therefore, may be incompensable and irreparable. In any event, to allow large losses of unrecoverable back wages to continue accumulating because plaintiff might be able to recover some far-lesser amount of damages from defendant would surely be an egregious instance of penny wisdom and pound foolishness.

Plaintiff has been summarily discharged from his job over an extraneous matter that never should have involved himself and defendant, much less become the source of a constitutional dispute in federal court. Nevertheless, like the devastating Chicago fire of 1871, that spread from the single misstep of Mrs. O'Leary's cow, this dispute now threatens to wreak rapidly increasing irreparable harm. Far from any one mere fact in itself being irreparable harm, the Court holds that the totality of the circumstances surrounding plaintiff's termination in this case demonstrably constitutes the very kind of irreparable injury that requires this extraordinary relief.

*2. Likelihood of Success on the Merits.*

In addition to the increasing, irreparable injury plaintiff is sustaining, his overwhelmingly strong probability of ultimate success on the merits justifies this extraordinary injunctive relief. Plaintiff presents four claims. First, plaintiff claims that he was deprived of his de facto property interest in his job, as a permanent employee, without the guarantees of procedural due process under the Fourteenth Amendment, procedural due process to which he is entitled. Further, he claims that he was not only stripped of his property right, but also subjected to scandalizing stigmata that hinder his attempts to secure other, similar employment, all without the fundamental guarantees of procedural due process. Second, plaintiff claims that his constitutionally protected right to freedom of association and speech, under the First Amendment, has been restricted and denied with-

out compellingly justifying reasons having been demonstrated in a forum of Fourteenth Amendment procedural due process. Third, plaintiff claims that his de jure property interest in his job, created by state law,[9] was taken from him without the guarantees of procedural due process to which he is entitled under the Fourteenth Amendment. Fourth, plaintiff claims that he was deprived of his de jure property interest in his job without the essentials of procedural due process that are guaranteed to him by the same state statute that created his property right.[10]

The Court need find a high probability of eventual success on only one of plaintiff's claims to justify issuing this preliminary injunction. There is no disagreement that plaintiff was a nonprobationary employee; and the only evidence to dispute that he was in fact a permanent employee was the testimony of defendant, Sheriff Bliss. Under examination by the Court, however, defendant admitted that this testimony was purely his own personal view, and not a statement of official policy. For the purposes of issuing this preliminary injunction, the Court finds that plaintiff was a permanent employee. There is no question that plaintiff was terminated from his job. The Court further finds that the fact of plaintiff's termination, together with the accusations of insubordination and unseemly conduct by a law enforcement officer, have been both heralded through the news media and transmitted to the official records that any potential law enforcement employer by law must consult.

▮▮▮ The law is unmistakable. As recently as February 24, 1976, while stating in *Mathews v. Elridge*, 424 U.S. 319, 332–333, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18, 32–34, 44 U.S.L.W. 4224, 4229 that whether due process requires a pre-termination or post-termination hearing in a given situation depends upon a balancing of the facts of the case as they relate to three essential factors, the Supreme Court declared:

This Court consistently has held that some form of hearing is required before an individual is finally deprived of [his] property interest. *Id.*, at 333, 96 S.Ct. at 902, 47 L.Ed.2d at 32, 44 U.S.L.W. at 4228.

It is long past the point of reasonable debate that a person may not be deprived of his property or liberty by a state or its officials without the fundamentals of procedural due process: (1) a hearing (2) before an impartial decision-maker, after (3) notice of the charges, and (4) with an opportunity to present one's own case. *Boehning v. Indiana Employees Ass'n*, 423 U.S. 6, 7, n. *, 96 S.Ct. 168, 169, n. *, 46 L.Ed.2d 148, 150, n. * (1975); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606, 608, 95 S.Ct. 719, 722, 42 L.Ed.2d 751, 756 (1975); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556 (1972); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570, 577 (1972); *Fuentes v. Shervin*, 407 U.S. 67, 80–82, 85, 86, 92 S.Ct. 1983, 1996, 1997, 32 L.Ed.2d 556, 573 (1972); *Stanley v. Illinois*, 405 U.S. 645, 657–58, 92 S.Ct. 1208, 1215–1216, 31 L.Ed.2d 551, 562 (1972); *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90, 96 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 266–71, 90 S.Ct. 1011, 1019–1022, 25 L.Ed.2d 287, 298–300 (1970); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 339, 89 S.Ct. 1820, 1821, 23 L.Ed.2d 349, 352 (1969). Whether procedural due process is provided by swift post-deprivation proceedings, *Arnett v. Kennedy supra*; or whether it is required prior to the deprivation at issue, *Perry v. Sinderman, supra*; *Velger v. Cawley*, 525 F.2d 334, 337 (2d Cir. 1975); *Muscare v. Quinn*, 520 F.2d 1212, 1214 (7th Cir. 1975); depends on how the peculiar circumstances of the case balance.

▮▮▮ For nearly five months since his termination, plaintiff has not been afforded any form of procedural due process. Furthermore, inasmuch as defendant expressly

---

9. *Fla.Stat.* Sec. 112.532(1)–(5) (Supp.1974).

10. *Fla.Stat.* Sec. 112.532(4)(Supp.1974).

admits that he does not presently intend, and never has intended, to provide such procedural due process, plaintiff cannot realistically expect such in the future. Consequently, the Court holds that in the circumstances of this case, plaintiff has a very strong likelihood of eventual success on the merits.

*3. Plaintiff's Harm Outweighs Defendant's Possible Harm.*

■ Plaintiff has met his burden of proof by showing the existence of irreparable harm, as the Court has concluded. The burden to produce evidence of some harm now shifts to defendant. Defendant contends that because the Lake County Sheriff's Department is a para-military organization, the need for defendant, as Sheriff, to maintain authority, regimen and discipline is paramount. The Court finds that view both familiar and reasonable. *See Muscare v. Quinn, supra,* at 1213. Nevertheless, it has its reasonable limitations also. Defendant cannot use the importance of maintaining the Sheriff's authority as a facade to conceal caprice. If, over a trifling personal matter, defendant can deprive plaintiff of his permanent employment without any intention of providing genuine due process, the morale of the other employees will inevitably decline, and with it the respect and authority of the Sheriff will be diminished. The undisputed evidence is that plaintiff is at least a satisfactory, or even excellent, deputy. The Court holds that there is no real harm that defendant will suffer by returning to his job an employee of plaintiff's quality who has never received any procedural due process.

*4. Issuing the Preliminary Injunction Will Not Disserve the Public Interest.*

■ The evidence uniformly establishes that plaintiff was a conscientious and capable deputy; and additionally, the Court has found that there exists no harm to defendant by returning plaintiff to his job *penden-*

*te lite.* Accordingly, the Court now holds that a preliminary injunction that prevents the termination of plaintiff, as a Lake County Sheriff's Deputy, will not work any disservice to the public interest; instead, it may well affirmatively serve the public interest to continue to employ a deputy sheriff of plaintiff's caliber.

The Court expects prompt and faithful compliance with this injunction by defendant, *Maness v. Meyers,* 419 U.S. 449, 458–59, 95 S.Ct. 584, 591, 42 L.Ed.2d 574, 582–583 (1975); *United States v. United Mine Workers,* 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884, 912 (1947). However the findings and conclusions of the Court herein, while firm for the purpose of issuing this preliminary injunction, are tentative and not binding with respect to the Court's ruling and final judgment on the merits of this case. *Poe v. Charlotte Memorial Hosp.,* 374 F.Supp. 1302, 1312 (W.D.N.C.1974).

It is now, therefore,

ORDERED:

1. Plaintiff's motion for a preliminary injunction is hereby granted.

2. Defendant, in his personal capacity, and in his official capacity as Sheriff of Lake County, acting through his agents and subordinates, his assigns and successors in interest, is hereby enjoined *pendente lite* from preventing, interfering with, or otherwise altering the employment of plaintiff as a Lake County Sheriff's deputy, as it existed before November 14, 1975.

3. Plaintiff is hereby ordered to post a bond of $250.00 with the Clerk of the Court as security for this preliminary injunction, pursuant to Fed.R.Civ.P. 65(c).

4. In the event that plaintiff posts the bond required by paragraph 3 within five days from date of this order, defendant, pursuant to this injunction, shall reinstate plaintiff to his permanent position as a deputy sheriff of Lake County, Florida, on or before April 19, 1976.

DONE AND ORDERED at Jacksonville, Florida, this 9th day of April, 1976.